# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| SWIPE ACQUISITION CORPORATION, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>PETER M. KRAUSS, WILLIAM E. MILLER II, HARRY K. BENHAM III individually and in his capacity as trustee of the Anne Kern Benham Trust, RONALD H. LEVENTHAL, MARK A. GOLDBERG individually and in his capacity as trustee of the Mark Alan Goldberg Trust, WEM FINANCIAL, LLC, a Florida Limited Liability Company, KRISTEN ZELLER-MILLER, KRISTEN ZELLER-MILLER IRA, LEVENTHAL ENTERPRISES, LLC, a Florida Limited Liability Company, KATHLEEN O. LEVENTHAL-JONES in her capacity as trustee of the Kathleen Leventhal Jones Family Trust, BRIARS-PLI, LLC, a Virginia Limited Liability Company, JULIE KRAUSS in her capacity as trustee of the Breverman Family Trust, AG/PLI INVESTMENT, LLC, a Delaware Limited Liability Company, PLI REAL ESTATE, LLC, a North Carolina Limited Liability Company, and JAMES R. URBACH, in his capacity as trustee of the PLI Holdings, Inc. Employee Stock Ownership Trust,<br><br>Defendants. | C.A. No. 2019-0509-PAF |

## MEMORANDUM OPINION

Date Submitted: May 5, 2020
Date Decided: August 25, 2020

David E. Ross and S. Michael Sirkin, ROSS ARONSTAM & MORITZ LLP; Wilmington, Delaware; Michael Farhang, Ari Lanin, Samuel A. Spears, GIBSON, DUNN & CRUTCHER LLP; Los Angeles, California; *Attorneys for Plaintiff.*

Michael F. Bonkowski, COLE SCHOTZ, P.C.; Wilmington, Delaware; Kevin A. Reck, Kara M. Wick, Emily Lang, FOLEY & LARDNER LLP; Orlando, Florida; *Attorneys for Defendants Peter M. Krauss, William E. Miller II, Ronald H. Leventhal, Mark A. Goldberg, Leventhal Enterprises, Kathleen O. Leventhal-Jones.*

Louis J. Rizzo, Jr., REGER RIZZO & DARNELL LLP; Wilmington, Delaware; William E. Shmidheiser, III, FLORA PETTIT; Harrisonburg, Virginia; *Attorneys for Defendants Harry K. Benham, III, Briars-PLI, LLC, Julie Krauss, WEM Financial, LLC, Kristen Zeller-Miller, Kristen Zeller-Miller IRA, AG/PLI Investment, LLC, and PLI Real Estate, LLC.*

Raymond H. Lemisch, KLEHR, HARRISON, HARVEY & BRANZBURG LLP; Wilmington, Delaware; *Attorney for Defendant James R. Urbach.*

**FIORAVANTI, Vice Chancellor**

This dispute arises out of the sale of PLI Holdings, Inc. ("PLI" or the "Company") to Plaintiff Swipe Acquisition Corporation ("Swipe"). Swipe alleges the sellers concealed the loss of a major customer shortly before consummating the sale, which constituted a breach of contract, fraud, and violation of a California statute. All but one of the defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted. This opinion resolves that motion with the exception of one count for which supplemental briefing is requested.

## I.     BACKGROUND

The facts recited in this opinion are drawn from the allegations in the Verified Complaint (the "Complaint") and the exhibits attached thereto.

### A.     The Sale Discussions

PLI is engaged in the design, manufacture, and distribution of gift cards, loyalty cards, and hotel keycards. Prior to the transaction, PLI was a privately held North Carolina corporation headquartered in Nevada and entirely owned by the Defendants ("Defendants" or the "Sellers").[1] Four of the Defendants—Peter M. Krauss, Harry K. Benham III, William E. Miller II, and Ronald H. Leventhal

---

[1] Defendant James R. Urbach is a defendant in his capacity as trustee of PLI's Employee Stock Ownership Trust. Urbach filed an answer rather than a motion to dismiss. Dkt. 49. For simplicity, this Opinion continues to refer to all of the Defendants collectively, but Urbach is excluded from the definition of "Defendants" to the extent that this Opinion references Defendants' motion to dismiss.

(collectively, the "Director Defendants")—served as the Company's four-person Board of Directors.[2] Krauss also served as the Company's President and Chief Executive Officer.[3]

Swipe is a Delaware corporation that was formed to acquire PLI. Swipe is indirectly owned by Platinum Equity Small Cap Fund, L.P. ("Platinum Small Cap").[4] Platinum Equity Advisors, LLC ("PEA") advises Platinum Small Cap.[5]

In early 2018, Krauss began discussing the sale of the Company with PEA. On January 9, 2018, Krauss negotiated and executed a confidentiality agreement with PEA, and PEA received a confidential information memorandum (the "CIM") from PLI and its bankers. The CIM featured Krauss as the head of PLI's management team. It touted that PLI had "sticky and longstanding relationships with key customers" which would provide a "highly attractive recurring revenue

---

[2] Compl. ¶ 39.

[3] *Id.* ¶ 41.

[4] *Id.* ¶ 1. The Complaint refers to PEA, Platinum Small Cap, and Swipe collectively as Swipe. Swipe, however, was not formed until May 22, 2018. As a result, in certain instances, the Complaint is not clear as to who specifically conducted due diligence or met with Defendants' representatives. Plaintiff alleges that any distinction between PEA, Platinum Small Cap, and Swipe does not matter, because all claims arising from the transaction have been assigned to Swipe, and Defendants did not argue that any imprecision in the Complaint or the assignment of the claims is relevant to their motion to dismiss. This opinion will refer to those negotiating to acquire PLI prior to Swipe's formation as the "Buyers."

[5] Compl. ¶ 1.

4

stream," and projected over 95% of its revenue in the coming year would come from "existing customers."[6]

The CIM described the Company's relationship with its customers, including First Data Corp. ("First Data"), a data and payment processor that serviced large retail clients like Amazon.com Inc. ("Amazon").[7]  The CIM stated that the Company was First Data's largest supplier of gift cards for First Data's clients, including Amazon, and that the Company's relationship with First Data accounted for 17% of the Company's revenues in the prior fiscal year.[8]  The CIM referred to Amazon as a "key player," one of the Company's "deep customer relationships," and part of a "recurring revenue model with [a] blue chip customer base."[9]

On February 15, 2018, PEA submitted an initial indication of interest to the Company.  On March 12, 2018, PEA representatives met with Krauss and other Company representatives who provided a management presentation consistent with the information provided in the CIM.

On April 2, 2018, Krauss and the Company's bankers provided the Buyers with information indicating that Amazon was the largest indirect buyer of the

[6] *Id.* ¶¶ 45-46.

[7] *Id.* ¶ 46.

[8] *Id.*

[9] *Id.* ¶ 47.

Company's products.[10]  The bankers provided the Buyers with projections showing that the Company's revenues from First Data and Amazon had grown each year since 2015 and were projected to continue growing in 2019.  On April 3-4, 2018, Krauss and other Company representatives told the Buyers that the Company held weekly calls with First Data and Amazon and that the Company often interacted directly with Amazon.[11]  Krauss and other Company representatives assured the Buyers at these meetings that Amazon would still want to use PLI to supply its cards even if Amazon were to switch to a data processor other than First Data.[12]

On April 18, 2018, the Buyers offered to purchase the Company for $210 million subject to additional due diligence, including calls with the Company's customers.[13]  On April 26, 2018, the Director Defendants authorized Krauss to negotiate a sale agreement.[14]  Between April 28 and May 9, 2018, the Buyers conducted due diligence through calls, onsite meetings to review the Company's accounting, and a tour of the Company's production facilities.[15]

---

[10] *Id.* ¶ 51.

[11] *Id.* ¶ 52.

[12] *Id.*

[13] *Id.* ¶¶ 56-57.

[14] *Id.* ¶ 58.

[15] *Id.* ¶ 60.

## B. PLI Learns that it Is Losing a Major Customer.

On May 8, 2018, Krauss learned that Amazon was going to terminate its relationship with First Data and move its business to one of the Company's competitors.[16] The Company's VP of Sales emailed Krauss, stating:

> I needed to bring you up to speed on a call that I was asked to join late yesterday afternoon with First Data . . . [First Data's representative] started off by letting us know that she had received communication towards the end of last week from Amazon indicating that they were putting orders on hold due to product oversupply. . . . Yesterday, they received a second communication from Amazon telling them that they were moving production from First Data to a direct supplier (Travel Tags) with a request for 16.5 million data records—essentially firing First Data from the production management aspect of their business. This came a total surprise to First Data. While First Data is looking at ways to win that business back, this is creating a hole that we (PLI & FD) are working to fill. [First Data's representative] actually brought up how First Data will do their best to fill the gap and try to keep PLI whole but in the short term, we will have a hill to climb.[17]

The Company's VP of Sales stated that it was "never news that I want to be giving, but I thought it was important to communicate it as quickly as possible for all the obvious reasons."[18]  To illustrate the consequence of losing Amazon's business, the VP of Sales pointed out that the Company had earned $12.2 million from Amazon in 2017 and $4.4 million through May 2018, and that the Company

---

[16] *Id.* ¶ 61.

[17] *Id.* ¶ 62.

[18] *Id.* ¶ 63.

had already forecast over $4 million in revenue for the remainder of May and June 2018.[19]

The news that the Company was going to lose Amazon's business spread among the Company's Board of Directors and its executives.[20] Krauss was concerned that it would cause the Buyers to walk away from the deal. In a meeting with the VP of Sales and another employee to discuss the loss of Amazon as an indirect customer, Krauss exclaimed that "if [the Buyers] learned of the Amazon termination, the deal would be 'over.'"[21]

Swipe alleges that Krauss purposefully concealed the loss of Amazon as a customer from the Buyers. As the Buyers sought to speak with the Company's customers as part of due diligence, the Company's executives expressed concerns internally that a particular First Data representative would say too much.[22] Krauss conditioned the Buyers' call with First Data on the Buyers' agreement that they would not "dig into sub-customers," including Amazon.[23] Krauss reinforced this agreement by instructing the Company's bankers to tell the Buyers that the First Data representative would be unable to discuss First Data's "sub-customer"

---

[19] Id. ¶ 64.

[20] Id. ¶¶ 65-67.

[21] Id. ¶ 65.

[22] Id. ¶ 75.

[23] Id. ¶ 78.

relationships.[24] Krauss and the First Data representative spoke with the Buyers on May 29, 2018, the day before the parties executed the SPA.[25] The Company and the Sellers never informed the Buyers of the termination of the First Data-Amazon business.[26]

The Complaint alleges that Krauss and the Company deceived the Buyers by providing misleading financial information. After learning of the impending loss of the Amazon business, the Sellers did not correct the financial information that the Company had already provided to the Buyers, which by then had become stale.[27] When the Sellers later provided the Buyers with the Company's weaker-than-expected performance information for April and May 2018, the Company and the Buyers reduced the purchase price to $195 million (subject to adjustments described in the SPA), but the Sellers still did not reveal the loss of the Amazon business.[28]

---

[24] *Id.* ¶ 81.

[25] *Id.*

[26] *Id.* ¶ 69.

[27] *Id.* ¶ 71.

[28] *Id.* ¶ 80.

## C. The Stock Purchase Agreement

The Company, Swipe, and the Sellers executed the SPA on May 30, 2018 and closed the transaction on June 29, 2018.[29] For purposes of the motion to dismiss, the pertinent provisions of the SPA concern the Sellers' representations and warranties about major customers and indemnity for losses.

Section 3.21 of the SPA contains representations and warranties about the Company's knowledge of anticipated business from its customers.[30] As discussed in further detail below, Swipe alleges the Defendants breached that provision and committed fraud by concealing the loss of the First Data-Amazon business.

In Section 8.3(a), the Sellers agreed "severally but not jointly" to indemnify "Buyer and its successors, permitted assigns and Affiliates" for what is defined in the SPA as "Losses," as a result of any breach of the representations or warranties by the Company or the Sellers.[31] Under the SPA, Swipe paid $1,050,000 into an Indemnity Escrow Account to secure and satisfy the Sellers' indemnification obligations.[32] Any claim for indemnification is subject to a deductible of $1,575,000, and Swipe's only remedy for any breach of representations and

---

[29] *Id.* ¶¶ 1, 82, 89. The SPA, as originally executed, is attached to the Complaint as Exhibit A. The SPA was amended on June 29, 2018, and the amendment is attached to the Complaint as Exhibit B.

[30] *Id.* Ex. A § 3.21.

[31] *Id.* §§ 8.2, 8.3(a). Losses includes damages and reasonable attorneys' fees.

[32] *Id.* at 2 (defining "Indemnity Escrow Amount"), *id.* § 2.4(f).

10

warranties is limited to the escrow, subject to certain exceptions. Among the exceptions is fraud on the part of the Company or the Sellers.[33]

On May 24, 2019, Swipe delivered a notice of its claim for indemnification to Krauss in his capacity as Seller Representative and to the escrow agent. The claim asserted that the representation and warranty in Section 3.21 was false because Defendants knew the Company would lose the First Data-Amazon business before the acquisition.[34] The notice represented that the losses suffered by Swipe exceeded the deductible, as well as the amount of the escrow.[35]

Defendants disputed Swipe's claim to indemnification and refused to release the escrowed funds.[36] Plaintiff filed the Complaint on June 28, 2019. On August 14, 2019, all Defendants except James R. Urbach filed a motion to dismiss the Complaint for failure to state a claim upon which relief can be granted. The parties briefed the motion, and the Court held a telephonic hearing on May 5, 2020.

## II. STANDARD OF REVIEW

The pleading standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) are minimal. *Central Mortg. Co. v. Morgan Stanley*

---

[33] *Id.* ¶ 96; *id.* Ex. A §§ 8.3(b), 8.5(a).

[34] *Id.* ¶ 104. *See also id.* Ex. A § 8.6 (requiring written notice of a claim for indemnification describing the "facts and circumstances giving rise" to the claim and the amount of the claim).

[35] *Id.* ¶ 104.

[36] *Id.* ¶¶ 105-07.

11

*Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011). On a motion to dismiss

for failure to state a claim:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations and

quotation marks omitted); *accord Central Mortg.*, 27 A.3d at 536.

## III. ANALYSIS

Plaintiff's Complaint contains four counts arising from Defendants' alleged

concealment of the First Data-Amazon business: (1) breach of contract; (2)

indemnification for breach of the representation in Section 3.21 and for fraud; (3)

common law fraud; and (4) violation of the California Securities Act, commonly

referred to as California's Blue Sky Law.[37]

Defendants have moved to dismiss each of the four counts. Defendants also

seek dismissal of Kristen Zeller-Miller in her individual capacity because Kristen

Zeller-Miller IRA, not Kristen Zeller-Miller, is named as a Seller in the SPA.

---

[37] Compl. ¶¶ 110-48.

**A.    The Complaint States a Claim for Breach of Contract.**

Defendants argue that Plaintiff's breach of contract claim for failure to release the escrow and to indemnify Plaintiff for breach of the representations and warranties in Section 3.21 of the SPA must be dismissed for two reasons. First, Defendants argue that Plaintiff's claim is based upon an unreasonable interpretation of Section 3.21.[38] Second, Defendants argue that Plaintiff has not adequately alleged damages.

**1.    Principles of Contract Construction and Interpretation**

"'Delaware adheres to the objective theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable third party.'" *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)); *accord Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014). When a contract's language is clear and unambiguous, the Court will give effect to the plain meaning of the contract's terms and provisions. *Osborn*, 991 A.2d at 1159-60. The contract is to be read as a whole, giving effect to each term and provision, so as not to render any part of the contract mere surplusage. *Id*. at 1159. The Court may also look to the grammatical construction of a contract

---

[38] Defs.' Opening Br. 8-10.

13

provision to determine its plain meaning. *ITG Brands, LLC v. Reynolds Am., Inc.*, 2017 WL 5903355, at *6 (Del. Ch. Nov. 30, 2017).

If, however, the contract is fairly susceptible to more than one reasonable interpretation, the Court may consider extrinsic evidence to resolve the ambiguity. *Salamone*, 106 A.3d at 374. "At the motion to dismiss stage, ambiguous contract provisions must be interpreted most favorably to the non-moving party. Thus, '[d]ismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation[s] [are] the *only* reasonable construction[s] as a matter of law." *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *8 (Del. Ch. Sept. 18, 2014) (emphasis in original) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003)).

### a. The Provisions Governing Disclosure of Major Customers

Section 3.21 of the SPA contains representations and warranties about PLI's customers and suppliers. Section 3.21(a) is at issue here. It consists of three sentences. The first sentence describes and defines PLI's most significant customers as the Company's Major Customers. These customers are individually identified in a schedule to the SPA. The last two sentences of Section 3.21(a) make representations and warranties as to the Company's knowledge of adverse developments relating to business from the Company's Major Customers and Major Indirect Customers:

14

Schedule 3.21 sets forth a true and complete list of (i) the names and addresses of the twenty most significant customers of the Company and its Subsidiaries, based on amounts billed to customers of the Company and its Subsidiaries during the 12 months ended March 31, 2018 (each, a "Major Customer"), (ii) the amount for which each such Major Customer was invoiced during such period and (iii) the percentage of the consolidated total sales of the Company and its Subsidiaries represented by sales to each such Major Customer during such period. No PLI Company has received any notice or has any knowledge that (A) any of its Major Customers has ceased or substantially reduced, or will or intends to cease or substantially reduce, use of, demand for, or the price it will pay for, any products or services of the Company or its Subsidiaries, or (B) any entity identified in Schedule 3.21 (each, a "Major Indirect Customer") has ceased or substantially reduced, or will or intends to cease or substantially reduce, use of, demand for, or the price it will pay for, any products or services of the Company or its Subsidiaries that are indirectly provided to such Major Indirect Customer, including by any Major Customer. None of such Major Customers or Major Indirect Customers has otherwise threatened to take any action described in the preceding sentence as a result of the consummation of the transactions contemplated by this Agreement.[39]

Schedule 3.21 lists First Data as the first Major Customer, representing the greatest percentage of the Company's sales to any customer.[40] Schedule 3.21 lists Amazon as the first Major Indirect Customer.[41]

Swipe alleges that Krauss knew the representation and warranty in the second sentence of Section 3.21(a) was false. Krauss knew it was false because he learned three weeks before executing the SPA that PLI's largest Major Customer,

_____

[39] Compl. Ex. A § 3.21(a).

[40] *Id.* Ex. D.

[41] *Id.*

15

First Data, would lose its business with Amazon, PLI's largest Major Indirect Customer. Plaintiff alleges that Krauss's knowledge can be imputed to all of the Defendants.[42]

Defendants argue Plaintiff's claim fails because it ignores the third sentence of Section 3.21(a), which represents: "None of such Major Customers or Major Indirect Customers has otherwise threatened to take any action described in the preceding sentence as a result of the consummation of the transactions contemplated by this Agreement."[43] Defendants contend the phrase "as a result of the consummation of the transactions contemplated by this Agreement" in the third sentence must be imported into the second sentence. Therefore, the representations in the second sentence are limited to knowledge that the Company's Major Customers and Major Indirect Customers would cease or reduce business as a result of the transactions contemplated by the SPA. According to Defendants, the third sentence "necessarily modifies the preceding sentence because it cannot reasonably be interpreted as an independent warranty under Delaware law" and that a breach of the last sentence "would necessarily result in a breach of the

---

[42] *See* Compl. ¶ 136.

[43] *Id.* Ex. A § 3.21.

16

preceding sentence."[44]    Defendants argue that any other interpretation would render the representation in the second sentence meaningless surplusage.[45]

Plaintiff argues, and the Court agrees, that an objective reading of Section 3.21(a) reflects that the second and third sentences are independent representations. The second sentence addresses any notice or knowledge that any Major Customer or Major Indirect Customer would cease or reduce business, regardless of the reason. The representation in the third sentence addresses any threat that a Major Customer or Major Indirect Customer would cease or reduce business as a result of the transactions contemplated by the SPA. In other words, the representation in the second sentence relates to reduction or cessation of business for any or no reason. The representation in the third sentence, however, concerns conditional threats of reduction or cessation of business because of the consummation of the SPA. There is no superfluous contract language under Plaintiff's construction because it is possible to breach the representation in the second sentence, but not the third

---

[44] Defs.' Opening Br. 9.

[45] *Id.* 10.

sentence, and vice versa.[46]  Because Plaintiff's reading is reasonable, this portion of the motion to dismiss is denied.

### 2.  Plaintiff Has Adequately Pleaded Damages.

"Rule 12(b)(6) requires notice pleading, not a statement of damages with precision."  *Eni Hldgs., LLC v. KBR Grp. Hldgs., LLC*, 2013 WL 6186326, at *22 (Del. Ch. Nov. 27, 2013).  "Proof of . . . damages and of their certainty need not be offered in the complaint in order to state a claim."  *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 156 (Del. Ch. 2003).

Defendants argue that Plaintiff's breach of contract claim should be dismissed in its entirety because its damages theory is flawed.  Plaintiff alleges that the purchase price was based on the assumption that Amazon would continue its business with the Company and that Buyers calculated an EBITDA multiple based

---

[46] As a concrete example, if a customer declared that it will no longer be a customer of the Company because it was going bankrupt, that would breach the first representation, but it would not breach the second representation, because its business would not cease as a result of the SPA.  Conversely, if a customer threatened to stop being a customer in the event that the SPA closed, that would breach the second representation, but not the first, because the cessation of business was conditioned upon closure of the SPA.  *See also* Oral Arg. Tr. 37-38 (Plaintiff's counsel explaining that, "[a]s an example, if PLI received notice, for example, of a customer's decision to terminate business with PLI for almost any reason whatsoever—but let's say it was unhappiness with the way PLI's products were working with the customer's business, some change of the business operations of the customer—that situation will satisfy the second sentence but not the third because that's essentially a notification of an intent . . . . It's not a threat made by a customer that something will occur as a result of the consummation of the agreement, which would happen at a later time.  The third sentence would be triggered if you had a threat by a customer to leave if the deal closes and the ownership changes.").

on their projection of the Company's growth. Plaintiff alleges that, taking into account the loss of Amazon's business, "Swipe overpaid by at least $47 million, even assuming Swipe did not alter its multiple applied to EBITDA."[47] Defendants argue that the Complaint does not plead enough facts to demonstrate that damages can be calculated with an EBITDA multiplier and, therefore, Plaintiff's breach of contract claim must be dismissed.[48] Defendants readily admit, however, that if Plaintiff had merely alleged it was damaged by $47 million without saying more, the Complaint would adequately allege damages. But Defendants insist that by disclosing the theory upon which damages is based, the Complaint must be dismissed because the theory is not viable.[49]

The Complaint adequately pleads that the Plaintiff suffered damages as a result of the alleged breach of contract. Beyond the allegation regarding an EBITDA multiple that Defendants focus on, Plaintiff alleges that the price it paid

---

[47] Compl. ¶ 11.

[48] Defs.' Opening Br. 11; Defs.' Reply Br. 6.

[49] At oral argument, Defendants conceded that damages could be pleaded generally in a complaint. Oral Arg. Tr. 13 ("So just with respect to the breach of contract, I don't really quibble with the proposition of law that somebody can simply generally state that they suffered damages as a result of the alleged breach."). Nevertheless, Defendants argued that Plaintiff had effectively triggered application of a heightened pleading standard because they "voluntarily cho[se] to allege a detailed allegation of damages based on an EBITDA methodology." *Id.* at 13-14; *see also* Defs.' Reply Br. 10 ("Had Plaintiff simply pleaded some amount of damages, be it $47 million or otherwise, Plaintiff may have complied with Delaware's pleading standards; but that is not what Plaintiff did.").

for the Company was inflated as a result of Defendants' concealment of the loss of Amazon as a customer and, as a result, Plaintiff is entitled to recovery from the escrow.[50]  The Complaint contains other non-conclusory allegations that Plaintiff sustained damage because it acquired the Company without knowing that Amazon was going to move its business elsewhere.[51]  These allegations are sufficient to plead damages.

Defendants' argument is also premature.  At the pleadings stage, it is reasonably conceivable that an EBITDA multiple could support a damages calculation.  Plaintiff alleges that the parties discussed using an EBITDA multiple to calculate the purchase price and that the Buyers, in fact, did so.[52]  Foreclosing calculating damages using an EBITDA multiple at this stage, as Defendants urge, would require the Court to make that determination without the benefit of a record and, worse yet, to ignore Plaintiff's allegations and, instead, draw inferences in favor of Defendants.  *See Savor*, 812 A.2d at 897 ("[T]he Court must draw all reasonable inferences in favor of the non-moving party").  In this case, the propriety of using an EBITDA multiple to assess damages presents a question of law and fact

---

[50] *See* Compl. ¶¶ 113-14, 120.

[51] *Id.* ¶ 12 (alleging damages arising from investigative costs, reduction the Company's ability to attract business from being unable to advertise Amazon as a customer, and the Company having to "reduce[e] or shutter[] operations—including at PLI's Chicago facility" to compensate for lost revenues from the Amazon business).

[52] *See id.* ¶¶ 11, 55.

20

to be resolved with the benefit of discovery. Indeed, the primary case upon which Defendants rely, *Zayo Grp. LLC v. Latisys Hldgs., LLC*,[53] is a post-trial opinion in which the Court had the benefit of a full record and expert testimony on the subject.[54] In rejecting the plaintiff's expert's damages theory, the Court observed that "there [was] no evidence that [the buyer] actually based its purchase price on a multiple of EBITDA."[55] Here, in contrast, Plaintiff alleges that it based its purchase

---

[53] 2018 WL 6177174 (Del. Ch. Nov. 26, 2018).

[54] *See* Defs.' Reply Br. 10-11. Defendants' other cases cited for the proposition that a court may dismiss a complaint where damages are not viable are also distinguishable. *Id.* 11-12. In *Williams Cos. Inc. v. Energy Transfer Equity*, 2017 WL 5953513, at *9 (Del. Ch. Dec. 1, 2017), this Court granted a motion to dismiss in part because there was no conceivable causal link between damages suffered by an alleged failure to obtain an updated fairness opinion or to disclose information to stockholders because the merger at issue was never consummated. Similarly, in *WSFS Fin. Corp. v. Great Am. Ins. Co.*, 2019 WL 2323839, at *5 (Del. Super. May 31, 2019), the court dismissed a claim for indemnification of consequential damages and found that the insurance agreement only permitted indemnification in part. These cases are distinguishable because Plaintiff has pleaded facts that render it reasonably conceivable that an EBITDA multiple was used by the parties in calculating the purchase price. *See Zayo*, 2018 WL 6177174, at *17 n.215 (discussing cases in which an EBITDA multiple had been used to calculate expectation damages in a breach of contract case, including "where it was undisputed that the parties relied on a multiple in calculating purchase price") (citing *Cobalt Operating LLC v. James Crystal Enters.*, 2007 WL 2142926 (Del. Ch. July 20, 2007)); *see also* Compl. ¶ 11 ("Swipe paid a dramatically inflated $195,000,000 base purchase price for PLI by means of an EBITDA multiple calculation that was discussed between the parties and that relied on Defendants' misrepresentations and omissions about the First Data Amazon business. Specifically, in determining the price it would pay for PLI, Swipe evaluated the Company's EBITDA and applied a multiple based on a projection of the company's growth and the projected length of Swipe's investment.").

[55] *Zayo*, 2018 WL 6177174, at *17.

price on a multiple of PLI's EBITDA.[56]  Defendants' motion to dismiss Count I of the Complaint is therefore denied.

### B.    The Complaint States a Claim for Indemnification.

Count II seeks indemnification from the escrow and for all Losses arising from the alleged breach of the representations and warranties in Section 3.21 and from fraud.[57]  Defendants argue that Count II is duplicative of Count I for breach of contract and must be dismissed.  Whether to dismiss a claim as duplicative is within the discretion of the Court.  *See Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013) ("A court may decline to consider a claim that is identical to or redundant with another.  The Court exercises that discretion here to dismiss the breach of warranty claim . . . . "); *Metropolitan Life Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 66232681, at *18 (Del. Ch.

---

[56] Compl. ¶ 11.

[57] *Id.* ¶¶ 121-33.

Dec. 20, 2012) ("When presented with two redundant or identical claims, a court may decline to consider one claim or the other.").[58]

The Court is not persuaded that Count II must be dismissed at this stage as duplicative of Count I. The Complaint states a claim that Defendants have denied Plaintiff indemnification for a breach of representations and warranties in the SPA and for fraud, and Defendants do not contend otherwise. Defendants only argue that the claim is redundant.[59] It is apparent that there is substantial overlap between

---

[58] Defendants also rely on *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009), and *Triton Const. Co., Inc. v. Eastern Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009), for the proposition that duplicative claims may be dismissed, but those cases are distinguishable. *Grunstein* concerned a "bootstrapping" question of whether parallel breach of fiduciary duty and breach of contract claims could proceed. That question is concerned with "the primacy of contract law over fiduciary law," an issue not implicated here. *Grunstein*, 2009 WL 4698541, at *6. *Triton* was a post-trial decision that declined to consider a civil conspiracy claim that was duplicative of the aiding and abetting claim. *Triton*, 2009 WL 1387115, at *1, 17.

[59] Defendants argue, in a footnote, that the indemnification claim should be dismissed because "Plaintiff's indemnification claim . . . is not ripe for adjudication [and] will not accrue until the underlying breach claim is adjudicated." Defs.' Opening Br. at 18 n.7 (citing *LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 197-98) (Del. 2009)). This argument is inconsistent with Defendants' principal argument that the indemnification and breach of contract claims are duplicative and, in any event, the parties have cited to numerous cases in which this Court has permitted indemnification and breach of contract or fraud claims to proceed in tandem. *See, e.g.*, *Osram*, 2013 WL 6199554, at *10; *ChyronHego Corp. v. Wight*, 2018 WL 3642132, at *11 (Del. Ch. July 31, 2018) (permitting claims for fraudulent misrepresentation and for indemnification to proceed).

23

Counts I and II, including the relief sought for both claims.[60]  Given the lenient standard under Court of Chancery Rule 12(b)(6), and in the exercise of discretion, the Court will deny the motion to dismiss Count II as duplicative.  Following development of the factual record, however, Defendants may revisit this issue by way of summary judgment.[61]  Accordingly, this portion of the motion to dismiss is denied.

### C.    The Complaint States a Claim for Common Law Fraud.

Count III alleges a claim for common law fraud against all Defendants. Defendants advance three arguments in support of their motion to dismiss Count III. First, Defendants argue that Plaintiff is improperly attempting to rely on extra-contractual representations as the basis for its fraud claim.  Second, Defendants contend Plaintiff has not pleaded damages with specificity.  Third, Defendants assert that Plaintiff's fraud claim is an improperly "bootstrapped" breach of contract claim.

---

[60] *See* Oral Arg. Tr. 45 ("The damages between the indemnification claim and the breach of contract claim may be different in the sense that the breach of contract claim includes losses that are captured by the indemnification claim but could also include foreseeable consequential damages and, as we pointed out in our briefing, could potentially be subject to mitigation arguments made by the defendants.").

[61] *See Espinoza v. Zuckerberg*, 124 A.3d 47, 67 n.102 (Del. Ch. 2015) (noting that "[t]he survival of one claim resulting in the survival of a duplicative claim often occurs at the motion to dismiss stage" and denying summary judgment on a claim for unjust enrichment where that claim was intertwined with a breach of fiduciary duty claim).

To state a claim for fraud, a plaintiff must plead: (1) that defendant made a false representation, usually one of fact; (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce the plaintiff to act or refrain from acting; (4) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of her reliance on the representation. *GreenStar IH Rep, LLC v. Tutor Perini Corp.*, 2017 WL 5035567, at \*10 (Del. Ch. Oct. 31, 2017) (quoting *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at \*6 (Del. Ch. Jan. 30, 2015)), *aff'd*, 186 A.3d 799 (Del. 2018).

The Plaintiff must also satisfy the heightened pleading standard of Court of Chancery Rule 9(b). Rule 9(b) requires that "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." As this Court has observed, however, it is "relatively easy to plead a particularized claim of fraud" based on a representation in a contract:

> The plaintiff can readily identify who made what representations where and when, because the specific representations appear in the contract. The plaintiff likewise can readily identify what the defendant gained, which was to induce the plaintiff to enter into the contract. Having pointed to the representations, the plaintiff need only allege facts sufficient to support a reasonable inference that the representations were knowingly false.

25

*Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015).

Defendants concede that the Complaint pleads all of the elements of a fraud claim, except for damages.

### 1. Plaintiff Has Adequately Alleged Damages Arising from Fraud.

Defendants argue that Plaintiff is required to plead damages arising from fraud with particularity. Yet "[e]ven when a plaintiff asserts a fraud claim, damages do not have to be pled with particularity. What has to be pled with particularity are 'the circumstances constituting fraud or mistake.' Unless a complaint seeks special damages, damages can be pled generally." *Bamford v. Penfold, L.P.*, 2020 WL 967942, at *21 (Del. Ch. Feb. 28, 2020) (quoting Ct. Ch. R. 9(b) and citing Ct. Ch. R. 9(g)). A plaintiff adequately pleads damages resulting from fraud when the complaint "sufficiently puts defendants on notice of the precise way in which [defendant] may have been harmed." *Carlton Inv. v. TLC Beatrice Int'l Hldgs., Inc.*, 1996 WL 189435, at *6 (Del. Ch. Apr. 16, 1996).

Plaintiff has pleaded that it overpaid for the Company as a result of the fraud and, while not required to do so, has advanced a methodology to support its primary damages calculation. These allegations are sufficient to plead damages from

fraud.[62]   As with the breach of contract claim, Defendants narrowly focus on disputing Plaintiff's $47 million damages figure because that calculation relies in part on an EBITDA multiple, but this argument fares no better against Plaintiff's fraud claim than it did with Plaintiff's breach of contract claim.   Plaintiff has adequately alleged that it discussed use of an EBITDA multiple during negotiations with Defendants in pricing the Company, and that it would have paid a different price but for the alleged fraud.[63]   For the reasons described above, Plaintiff has alleged damages to support its fraud claim.[64]   *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 146-47 (Del. Ch. 2003) ("The court is unconvinced that Wexford has not adequately alleged damages. Wexford has alleged that it suffered damages because of its decision to participate in the February 2001 Offering, which was based on the false representations made by the defendants. This allegation is stated with enough particularity to satisfy the requirements of Rule 9(b).").

---

[62] Defendants rely on cases from our sister court holding that damages must be pleaded with particularity to sustain a claim for fraud. Defs.' Opening Br. 20-21.  Any difference in the law is inconsequential because, as described above, Plaintiff has pleaded damages with particularity.

[63] Compl. ¶ 11 ("Swipe paid a dramatically inflated $195,000,000 base purchase price for PLI by means of an EBITDA multiple calculation that was discussed between the parties and that relied on Defendants' misrepresentations and omissions about the First Data Amazon business.").

[64] *See id.* ¶ 12.

### 2. Plaintiff Has Pleaded that Defendants Committed Fraud Through Concealing the Loss of the First Data-Amazon Business.

Defendants argue that the fraud claim must be dismissed because Plaintiff is relying on extracontractual representations disclaimed by the SPA. Specifically, Defendants cite Section 9.17 of the SPA, in which Plaintiff disclaimed reliance on extra-contractual representations:

> Buyer acknowledges and agrees that none of the Company, the Sellers, or any of their respective Affiliates or representatives has made, and Buyer and its Affiliates have not relied on, any representation or warranty, express or implied, written, oral, or otherwise, at law or in equity, regarding any PLI Company, any Seller, or their respective businesses, assets, liabilities or operations, except for the representations and warranties specifically and expressly set forth in Article III and Article IV of this Agreement (in each case, as modified by the Disclosure Schedules to the extent provided in Section 9.10).[65]

Delaware law permits representations and warranties in a contract to form the basis for fraud claims even where a purchaser has disclaimed reliance on extra-contractual representations in the contract. *See Prairie Capital*, 132 A.3d at 49-59 (analyzing the effect of an anti-reliance clause and holding that the fraud claim "largely survives at the pleading stage to the extent that [counterclaimant] relies on representations in the SPA."). This Court recently addressed a similar issue in *ChyronHego Corp. v. Wight*.[66] In *ChyronHego*, the Court determined that an anti-

---

[65] Compl. Ex. A § 9.17.

[66] 2018 WL 3642132 (Del. Ch. July 31, 2018).

reliance clause barred fraud claims based on extra-contractual representations. *Id.* at *4-7. The Court held, however, that the anti-reliance clause did not bar a fraud claim based on a representation in the contract that none of the company's customers had given "written notice, or to the knowledge of the Company, otherwise informed the Company" that the customer would terminate its relationship with the company or "materially reduce its purchases from or sales or provisions of services to the Company." *Id.* at *7-8.

The same result holds here. The fraud claim is primarily based on the representations and warranties in Section 3.21 that the Company did not have notice or knowledge that any of its Major Customers or Major Indirect Customers intended to cease or substantially reduce demand for PLI's products, and concealment of that knowledge, which induced Buyers to enter into the transaction.[67] The anti-reliance clause of the SPA specifically permits Plaintiff to have relied on representations and warranties in Article III, including Section

---

[67] Compl. ¶¶ 135-42; *see also id.* ¶ 138 ("In causing PLI to make the false and material representations and warranties in Section 3.21 of the SPA, and in making material omissions, including concealing the termination of the First Data Amazon business as alleged herein, Defendant Krauss and the Seller Defendants intended to defraud Swipe and induce Swipe to rely on the representations in the SPA and agree to consummate a transaction at a dramatically inflated purchase price.").

3.21.[68]  Plaintiff has thus stated a claim for fraud that is not barred by the anti-reliance clause in the SPA.[69]

### 3. The Fraud Claim Is Not a Bootstrapped Breach of Contract Claim.

A contracting party may not "bootstrap" a breach of contract claim into a fraud claim "merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform." *Iotex Comm'cns, Inc. v. Defries*, 1998 WL 914265, at \*5 (Del. Ch. Dec. 21, 1998). Generally, the anti-bootstrapping rule applies when a plaintiff attempts to transmute a breach of contract claim into a fraud claim by adding conclusory allegations to its breach of contract allegations. *See Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, 2020 WL 4692287, at \*16 (Del. Ch. Aug. 13, 2020) ("A bootstrapped fraud claim thus takes the simple fact of

---

[68] *Id.* Ex. A § 9.17.

[69] To the extent the Complaint pleads that other representations or omissions constitute fraud, such representations and omissions may be considered in determining whether the representations and warranties in Section 3.21 were fraudulent, but such representations or omissions cannot form the basis of Plaintiff's fraud claim. *See Prairie Capital*, 132 A.3d at 52-53 ("For arms' length counterparties . . . contractual provisions that identify the representations on which a party exclusively relied define the universe of information that is in play for purposes of a fraud claim. A party may use external sources of information to plead that a contractually identified fact was false or misleading, but a party cannot point to extra-contractual information and escape the contractual limitation by arguing that the extra-contractual information was incomplete."); *ChyronHego*, 2018 WL 3642132, at \*6 ("The Plaintiffs here are free to sue for fraud, but the anti-reliance language of Section 4.7 dictates what representations may form the basis for such fraud.").

nonperformance, adds a dollop of the counterparty's subjective intent not to perform, and claims fraud.").

Swipe is not bootstrapping its breach of contract claim into a fraud claim. Contractual representations may form the basis for a fraud claim where a plaintiff has alleged facts "sufficient to support a reasonable inference that the representations were knowingly false." *Prairie Capital*, 132 A.3d at 62. Thus, the anti-bootstrapping rule does not apply where a plaintiff has made particularized allegations that a seller knew contractual representations were false or lied regarding the contractual representation, or where damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim. *See Anschutz Corp. v. Brown Robin Capital, LLC*, 2020 WL 3096744, at \*15 (Del. Ch. June 11, 2020) (recognizing that the bootstrapping rule does not apply where "the plaintiff/buyer . . . can plead 'either: (1) that the Seller knew that the Company's contractual representations and warranties were false; or (2) that the Seller itself lied to Buyer about a contractual representation and warranty' and because damages for fraud would be distinct from damages for breach of contract") (quoting *Abry P'rs V, L.P. v. F &W Acquisition LLC*, 891 A.2d 1032, 1064 (Del. Ch. 2006)); *Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at \*3 (Del. Ch. Dec. 31, 2019) (ORDER) ("Even if one assumes for the sake of argument that InTouch's contract claim for breach of Section 17.2 and its fraud claim based on

31

statements made in Section 17.2 involved the same conduct, it is quite possible that the measure of damages for the fraud claim would be different given the public policy against fraud. For this reason alone, it would be premature to dismiss the fraud claim insofar as it is based on Section 17.2.").

Plaintiff has made particularized allegations that Krauss knew that the statements in Section 3.21 were false. The Complaint alleges that Krauss was notified that the Company was losing its Amazon business on May 8, 2018 and communicated to another employee that if the Buyer learned that fact, "the deal would be over!"[70] Krauss is alleged to have choreographed a due diligence call between the Buyers and First Data that avoided disclosure of the loss of the Amazon business.[71] These allegations distinguish Plaintiff's fraud claim from its breach of contract claim and are more than adequate to state a claim for fraud.

The anti-bootstrapping rule also does not apply here because Plaintiff might be entitled to greater damages through its fraud claim than its breach of contract claim. Without proving fraud, it is possible that Plaintiff's damages are limited to

---

[70] Compl. ¶ 65

[71] *Id.* ¶¶ 61-65, 68-90; *see also id.* Ex. A § 8.5(e) (providing that it is "expressly understood that Fraud committed or directed by a senior management employee, officer or director of the Company shall be deemed to be Fraud committed by the Company, for which the Indemnifying Sellers shall be liable pro rata in accordance with their respective Indemnifying Seller Shares which amount shall not exceed the consideration received by such Indemnifying Seller under this Agreement").

recovery from the escrow and would be subject to the deductible in the SPA.[72]

Because Plaintiff's damages could be different in the event that it prevails on its

fraud claim, and because its fraud claim is distinct from its breach of contract claim,

the motion to dismiss Plaintiff's fraud claim as a "bootstrapped" or duplicative

breach of contract claim is denied.

**D.  Additional Briefing Is Requested on the California Blue Sky Law Claim.**

Count IV alleges that Defendants violated the California Securities Act (also

referred to in the Complaint and herein as the California Blue Sky Law) by selling

their stock in the Company to Plaintiff through a communication that included a

material misstatement or omission.[73]  Defendants have moved to dismiss this claim

---

[72] *Id.* §§ 8.5(a) ("there will be no Deductible with respect to . . . any Fraud on the part of the Company or any Seller"); 8.5(e) ("neither the Deductible nor the General Cap shall apply to, any claim for indemnification in the case of Fraud against the Person who committed such Fraud (it being expressly understood that Fraud committed or directed by a senior management employee, officer or director of the Company shall be deemed to be Fraud committed by the Company, for which the Indemnifying Sellers shall be liable pro rata in accordance with their respective Indemnifying Seller Shares which amount shall not exceed the consideration received by such Indemnifying Seller under this Agreement)."). *See also id.* at 92 (defining "Fraud" to mean "intentional fraud with respect to the making of any representation or warranty in Article III . . . provided that subject to Section 8.5(c), such intentional fraud shall be deemed to exist only if the Person making such representation or warranty, or in the case of any representation or warranty of the Company in Article III, any Seller, had actual knowledge (as opposed to imputed or constructive knowledge) that such representation or warranty was actually breached when made or deemed made.").

[73] *Id.* ¶ 144 (citing Cal. Corp. Code §§ 25401, 25501).

because Section 9.6 of the SPA contains a choice-of-law provision selecting Delaware law:

> This Agreement, and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warrant made in or in connection with this Agreement or as an inducement to enter into this Agreement), shall be governed by, and enforced in accordance with, the internal laws of the State of Delaware, including its statutes of limitations.[74]

Defendants argue that the California Blue Sky Law is "preempted" by the Delaware choice-of-law provision.[75] The motion to dismiss Count IV presents two legal issues not fully addressed by the parties' briefing. First, does Section 9.6 of the SPA effect an express or implied waiver of Plaintiff's ability to assert a claim under the California Securities Act? Second, if the answer to the first question is yes, is Section 9.6, as applied to the California Securities Act claim, contrary to the fundamental public policy of California and, therefore, unenforceable?[76] It would

---

[74] Compl. Ex. A § 9.6.

[75] Defs.' Opening Br. 27.

[76] The inclusion of a Delaware choice-of-law provision would not, standing alone, permit Plaintiff to state a claim under the Delaware Securities Act. *See FdG Logistics LLC v. A&R Logistics Hdlgs., Inc.*, 131 A.3d 842, 855-56 (Del. Ch.) (holding that a Delaware Securities Act claim requires a sufficient nexus with Delaware), *aff'd*, 148 A.3d 1171 (Del. 2016).

be helpful to the Court for the parties to submit additional briefing on these issues.[77]

Defendants also seek dismissal of the California Securities Act claim for failure to plead damages separate and apart from the breach of contract claim. Defendants cite no California law to support this proposition.[78]  In any event, as discussed above with respect to Plaintiff's common law fraud claim, the Court cannot conclude that Plaintiff's damages for the breach of contract claim and the fraud claim are identical.  Therefore, the motion to dismiss Count IV on this basis is denied.

### E.    The Complaint Does Not State a Claim Against Kristen Zeller-Miller in Her Individual Capacity.

The Complaint names Kristen Zeller-Miller, individually and as a representative of the Kristen-Zeller Miller IRA, as a Defendant.  Only the Kristen

---

[77] *See* Cal. Corp. Code § 25701 ("Any condition stipulation or provision purporting to bind any person acquiring any security to waive compliance with any provision of this law or any rule or order hereunder is void."); *Hall v. Superior Court*, 197 Cal. Rptr. 757 (Cal. Ct. App. 1983) (referring to Section 25701 as the "cornerstone" of the California Securities Law and that "the parties may not waive or evade the application of California law to the transaction by private agreement"); *Verdugo v. Alliantgroup, L.P.*, 187 Cal. Rptr. 3d 613, 626 (Cal. Ct. App. 2015) (indicating that, to enforce a choice-of-law provision, the defendant bears the burden of showing that enforcement of the choice-of-law provision "will not in any way diminish the plaintiff's unwaivable statutory rights").

[78] The only case cited is *Ridley v. Bayhealth Med. Ctr., Inc.*, 2018 WL 1567609, at *5-6 (Del. Super. Mar. 20, 2018).  *Ridley* is inapplicable.  *Ridley* involved Delaware law, not California law, and it did not involve a securities law statute.

Zeller-Miller IRA is a party to the SPA as a Seller.[79] At oral argument, Plaintiff acknowledged that it was not suing Kristen Zeller-Miller in her individual capacity and that the Complaint was in error to the extent that it named her as an individual, except with respect to Plaintiff's fraud claim.[80]

Plaintiff has not stated a fraud claim against Kristen Zeller-Miller in her individual capacity. As noted above, the crux of Plaintiff's fraud claim is that the representations and warranties in Section 3.21 were knowingly false when made. The Complaint has not pleaded that Kristen Zeller-Miller in her individual capacity participated in any fraud. Although the Sellers contractually agreed that they could be required to indemnify Swipe in the event that a senior management employee committed or directed fraud, that provision does not extend to Kristen Zeller-Miller in her individual capacity because she is not defined as an Indemnifying Seller under the contract.[81] The claims against Kristen Zeller-Miller in her individual capacity are therefore dismissed.

---

[79] Compl. Ex. A at 1 (stating that the "Persons identified as a Seller" are identified in Appendix 1); *id.* App. 1 (listing the Kristen Zeller-Miller IRA as a Seller).

[80] Oral Arg. Tr. 72 ("[T]o the extent that Ms. Zeller-Miller signed the contract on behalf of the IRA for purposes of the indemnification and breach of contract claims, she is being sued as essentially the representative of the IRA for the purposes of that contract. However, the fraud claim involves a species of violation outside of the form of the contract and really has to do with actions taken by defendants. So I would not confine the issues on the fraud claim simply to some action taken in the capacity of another.").

[81] Compl. Ex. A § 8.5(e); *see also id.* at 93 (defining "Indemnifying Seller as "all Sellers other than the ESOP").

## IV.   CONCLUSION

For the foregoing reasons, the Motion to Dismiss is denied as to Counts I, II, and III, except as to the claims against Kristen Zeller-Miller in her individual capacity, which are dismissed.  The motion to dismiss Count IV is denied in part, and the Court defers decision on the remainder of Count IV pending supplemental briefing.  The parties are requested to submit a briefing schedule within one week of this opinion.

**IT IS SO ORDERED**.